NOT FOR PUBLICATION

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |
| In re: | |
| BERNARD L. MADOFF, | |
| Debtor. | |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 10-05311 (CGM) |
| v. | |
| UBS EUROPE SE (f/k/a UBS (LUXEMBOURG) S.A.), UBS FUND SERVICES (LUXEMBOURG) S.A., UBS THIRD PARTY MANAGEMENT COMPANY S.A., M&B CAPITAL ADVISERS SOCIEDAD DE VALORES, S.A., RELIANCE INTERNATIONAL RESEARCH LLC, LUXEMBOURG INVESTMENT FUND AND LUXEMBOURG INVESTMENT FUND U.S. EQUITY PLUS, as represented by their Liquidators MAÎTRE ALAIN RUKAVINA and PAUL LAPLUME, MAÎTRE ALAIN RUKAVINA and PAUL LAPLUME, in their capacities as liquidators and representatives of LUXEMBOURG INVESTMENT FUND AND LUXEMBOURG INVESTMENT FUND U.S. EQUITY PLUS, | |
| Defendants. | |

**MEMORANDUM DECISION DENYING UBS DEFENDANTS' MOTION TO DISMISS**

**A P P E A R A N C E S :**

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, New York 10166
*Attorneys for Defendants UBS Europe SE, Luxembourg Branch (f/k/a UBS (Luxembourg) S.A.),*
*UBS Fund Services (Luxembourg) S.A., and UBS Third Party Management Company S.A.*
By:    Marshall King
       Gabriel Herrmann
       Keith R. Martorana

BAKER HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA*
*Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of*
*Bernard L. Madoff*
By:    Oren J. Warshavsky
       David J. Sheehan
       Gonzalo Zeballos
       Tatiana Markel

OF COUNSEL: BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
By:    Benjamin Pergament
       Robertson Beckerlegge
       Geoffrey A. North
       Michelle R. Usitalo


**CECELIA G. MORRIS**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the motion of the Defendants, UBS Europe SE (f/k/a UBS

(Luxembourg) S.A.) ("UBS SA"), UBS Fund Services (Luxembourg) S.A. ("UBSFSL"), UBS

Third Party Management Company S.A. ("UBSTPM," and together with UBS SA and UBSFSL,

the "UBS Defendants"), to dismiss the complaint of Irving Picard, the trustee ("Trustee") for the

liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") seeking to recover

subsequent transfers allegedly consisting of BLMIS customer property.  (Mot. Dismiss, ECF No. 289).  The UBS Defendants seek dismissal for failure to state a claim due to the "safe harbor" provision of the Bankruptcy Code; for failure to plead actual intent to defraud on the part of BLMIS; and for failure to allege that they received BLMIS customer property.  UBSFSL and UBSTPM move to dismiss for lack of personal jurisdiction.  For the reasons set forth herein, the motion to dismiss is denied in its entirety.

## Jurisdiction

This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, Adv. Pro. No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08-CV-10791, and has been referred to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O).  This Court has subject matter jurisdiction over these adversary proceedings pursuant to 28 U.S.C. §§ 1334(b) and 157(a), the District Court's Standing Order of Reference, dated July 10, 1984, and the Amended Standing Order of Reference, dated January 31, 2012.  In addition, the District Court removed the SIPA liquidation to this Court pursuant to SIPA § 78eee(b)(4), (*see* Order, Civ. 08– 01789 (Bankr. S.D.N.Y. Dec. 15, 2008) ("Main Case"), at ¶ IX (ECF No. 1)), and this Court has jurisdiction under the latter provision.  Personal jurisdiction has been contested by two Defendants and will be addressed *infra*.

**Background**

The Court assumes familiarity with the background of the BLMIS Ponzi scheme operated by Bernard L. Madoff ("Madoff") and its SIPA proceeding. *See Picard v. Citibank, N.A. (In re BLMIS),* 12 F.4th 171, 178–83 (2d Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard,* 142 S. Ct. 1209, 212 L. Ed. 2d 217 (2022).

This adversary proceeding was filed on December 7, 2010.  (Compl., ECF[1] No. 1).  The Trustee filed a second amended complaint on February 24, 2023 (the "Complaint").  (Am. Compl., ECF No. 284).  Via the Complaint, the Trustee is seeking to recover transfers of customer property allegedly made by BLMIS to the UBS Defendants, to M&B Capital Advisers Sociedad De Valores, S.A. ("M&B"), and to Reliance International Research LLC ("RIR").  (*Id.* ¶¶ 270–76).

The Complaint alleges that Defendants were essential to the formation of Luxembourg Investment Fund U.S. Equity Plus ("LIF-USEP").  (*Id.* ¶¶ 77, 87–99).  LIF-USEP was a feeder fund of BLMIS which invested wholly with BLMIS in New York.  (*Id.* ¶¶ 1–2, 65, 99, 126).  The Complaint alleges that LIF-USEP was created to invest in BLMIS with full knowledge of BLMIS' fraud.  (*Id.* ¶ 65) ("[LIF-USEP's] *raison d'être* was to invest with and profit from BLMIS's operations, which LIF-USEP and its agents knew took place in New York.").

The UBS Defendant were each wholly owned subsidiaries of UBS AG.  (*Id.* ¶ 73).  The Defendants and other subsidiaries of UBS AG market themselves as part of a "worldwide financial network" that is "based on 'the experience, know-how, and substantial resources provided by the UBS Group as a whole.'" (*Id.*).

---

[1] Citations to this Court's electronic docket refer to the docket of adversary case number 10-05311 unless otherwise noted.

Defendant UBS SA is a "Societas Europaea" incorporated in Germany, is registered with the Register of Commerce of Frankfurt (HRB 107046), and has a registered office in Frankfurt am Main. (*Id.* ¶ 69). UBS SA was formally known as UBS (Luxembourg) SA) ("UBS SA") before its merger and absorption into UBS Europe SE in December 2016. (*Id.*). UBS SA was "listed as LIF-USEP's custodian, main distributor, and main paying agent in the fund's prospectus." (*Id.*).

Defendant UBSFSL is a Luxembourg limited liability company incorporated as a *société anonyme* and has a its registered office at in Luxembourg. (*Id.* ¶ 70). The Complaint alleges that UBSFSL acted as LIF-USEP's administrative agent while playing a "a critical role in LIF-USEP's operation, management, and servicing." (*Id.*). Defendant UBSFSL performed daily tasks of the feeder fund. (*Id.*).

Defendant UBSTPM is a Luxembourg limited liability company incorporated as *a société anonyme* with registered office in Luxembourg. (*Id.* ¶ 71). UBSTPM allegedly managed and administered the feeder fund, monitored investment policies and restrictions, and "was officially responsible for LIF-USEP's investment management decisions." (*Id.*).

The feeder fund's alleged knowledge of BLMIS's fraud centers on the relationship between Manuel Echeverría and Madoff. (*Id.* 257–63). Echeverría was the agent of LIF-USEP and of M&B with respect to LIF-USEP's investments with BLMIS. Prior to the creation of LIF-USEP, Echeverría had "been in charge of the Madoff relationship for Optimal U.S. Equity Fund . . . a $3.2 billion BLMIS feeder fund." (*Id.* ¶ 2). In this role, Echeverría "cultivated a relationship with Madoff and a network of Madoff-approved investment professionals." (*Id.*). Bernard Madoff "viewed Echeverría as one of his top European envoys and a source of new investment capital." (*Id.* ¶ 91).

The Complaint alleges that Echeverría had brought a group of well-connected investment professionals together around Morenes and Botín, two principals of M&B, to establish LIF-USEP in 2005 as a feeder fund of BLMIS. (Am. Compl. ¶¶ 2,87). Echeverría had done so to "unlock an opportunity for direct BLMIS investment" that would get past the limits imposed by investing with other feeder funds. (*Id.* ¶¶ 88–89). Echeverría developed the architecture for LIF-USEP. (*Id.* ¶ 92). M&B was to serve as "the fund's distributor, signing a Consultancy and Exclusive Introducing Agreement with UBS SA." (*Id.*).

The Complaint alleges that Echeverría regularly communicated with Madoff in person, by telephone, and by fax regarding LIF-USEP's establishment and operation. (*Id.* ¶ 261) ("At least fifty times during LIF-USEP's existence, Echeverría communicated with Madoff, Reliance, or UBS on LIF-USEP's and M&B's behalf, in furtherance of the effort to expand BLMIS investment."). Echeverría "arranged for a meeting with Madoff and facilitated the opening of a BLMIS account for LIF-USEP." (*Id.* ¶ 93). He assembled service providers that would be acceptable to regulators and to Madoff. (*Id.* ¶ 94). Knowing that Reliance, a firm headed by his friend, Tim Brockman, sought access to a BLMIS feeder fund, Echeverría approached Brockman about LIF-USEP. (*Id.* ¶ 95). Brockman then committed Reliance Gibraltar to serve as LIF-USEP's official investment advisor. (*Id.*).

Knowing that UBS had acted as a service provider for other BLMIS feeder funds, Echeverría traveled with the director of M&B "to Luxembourg to meet with UBS SA about LIF-USEP. As it had with Luxalpha, UBS signed on to serve as LIF's official sponsor, administrator, and custodian." (*Id.* ¶¶ 96–97). UBS "agreed to stock LIF-USEP's board of directors with UBS employees." (*Id.* ¶ 98). LIF-USEP's board of directors was stocked with UBS SA employees.

(*Id.* ¶¶ 98, 260).  "All five of LIF-USEP's directors were employees of UBS SA."  (*Id.* ¶ 98).

This architecture was in place when LIF-USEP was formed in August 2005.  (*Id.* ¶ 99).

Echeverría worked as M&B's and LIF-USEP's agent after the latter's formation and

carried out "a number of behind-the-scenes roles critical to the fund's success."  (*Id.* ¶ 100).  He

managed the "flow of subscription and redemption requests" while also making sure to not

trigger the "irritation of Madoff . . . with inopportune redemption requests." (*Id.*).

## Trustee's Complaint

In his Complaint, the Trustee asserts four counts.  (Am. Compl. ¶¶ 284–308).  Counts one

and four are directed at LIF-USEP and against Luxembourg Investment Fund SICAV ("LIF")

the alleged umbrella fund of LIF-USEP.  (*Id.* ¶¶ 65, 284, 302).  Count two is directly solely

against LIF-USEP.  (Id. ¶ 291).  Via count three of the Complaint, the Trustee seeks to recover

transfers of BLMIS customer property that BLMIS made to LIF-USEP (the "Initial Transfers")

and were subsequently transferred to the UBS Defendants, M&B, and RIR (the "Subsequent

Transferees").  (*Id.* ¶¶ 297–300).

## Initial Transfers

According to the Complaint, "LIF-USEP maintained BLMIS account no. 1FR123."  (*Id.*

¶ 264).  LIF-USEP sent funds to BLMIS or to BLMIS's JPMorgan Chase in New York, Account

No. xxxxxxxxxxx1703 (the "703 Account") "for application to the [1FR123] Account and the

purported conducting of trading activities."  (*Id.* ¶ 265).  Within two years of the filing date,

BLMIS allegedly made transfers to or for the benefit of LIF-USEP of at least $498.3 million.

(*Id.* ¶ 266).  The Trustee is seeking to avoid and recover the initial transfers paid from BLMIS to

the LIF-USEP pursuant to 11 U.S.C. §§ 548, 550(a)(1) and to 15 U.S.C. § 78fff-2(c)(3).  (*Id.* ¶

266).

**Subsequent Transfers**

Count three is asserted against all three of the UBS Defendants and against M&B and RIR. (Am. Compl. ¶ 297). The Complaint alleges that LIF-USEP transferred some portion of the Initial Transfers to each of the Defendants "as payment for their alleged service of LIF-USEP," thereby constituting subsequent transfers. (*Id.* ¶ 270). The Complaint alleges that UBS SA received $5,162,211 from LIF-USEP in fees for serving as its official custodian from September 2005 to December 2008 and an additional $291,368 in fees for serving as LIF-USEP's official manager from September 2005 through at least April 2006. (*Id.* ¶ 271). UBSFSL received $747,560 in fees from LIF-USEP for serving as its official administrator from September 2005 to December 2008. (*Id.*). UBSTPM received at least $10,590,437 from LIF-USEP for serving as its official manager from May 2006 to December 2008. (*Id.*). In total, based on the Trustee's investigations to date, the UBS Defendants received at least $18,537,826 million in subsequent transfers from LIF-USEP. (*Id.*). The Complaint alleges that Defendants M&B and RIR received $9,803,268 and $4,324,482, respectively, in subsequent transfers from LIF-USEP. (*Id.* ¶¶ 272–73).

On May 5, 2023, the UBS Defendants filed a motion to dismiss the Complaint against them. (Mot. Dismiss, ECF No. 289). In the motion to dismiss, Defendants argue that § 546(e) of the Bankruptcy Code, known as the "the safe harbor" bars the Trustee from recovering all alleged subsequent transfers from BLMIS to LIF-USEP made more than two years before the petition date; that the Trustee cannot use the Ponzi scheme presumption to assert "actual fraudulent intent" on the part of BLMIS, which precludes him from avoiding the transfers made within two years of filings that the Trustee; that the Trustee has failed to plead that Defendants received customer property of BLMIS; and that the Trustee has failed to establish personal

jurisdiction over UBSFSL and UBSTPM. (*See* Mem. L., ECF No. 289). The Defendants assert

the Good Faith defense against the recovery of subsequent transfers. (*Id.*). The Trustee has

opposed the motion. The parties waived oral argument on this motion. (Stip. and Order, ECF

No. 312).

**Discussion**

**Personal Jurisdiction**

UBSFSL and UBSTPM (the "UBS PJ Defendants")—both foreign entities or persons—

seek dismissal for lack of personal jurisdiction. Defendant UBS SA does not oppose personal

jurisdiction. (Mot Dismiss 7 n.3, ECF No. 289) ("Pursuant to stipulation so-ordered by the Court

on June 18, 2013, UBS Lux agreed not to contest personal jurisdiction in this action. *See* ECF

No. 157"). The Trustee argues that there is specific jurisdiction over the UBS PJ Defendants.

(Opp'n 7, ECF No. 303).

**Specific Jurisdiction**

In the Complaint, the Trustee argues that the UBS PJ Defendants maintained minimum

contacts with New York in connection with the claims in this adversary proceeding. (Am.

Compl. ¶ 17).

To survive a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2)

of the Federal Rules of Civil Procedure, the Trustee "must make a prima facie showing that

jurisdiction exists." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018) (quoting

*Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010)). A trial court has

considerable procedural leeway when addressing a pretrial dismissal motion under Rule 12(b)(2).

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013). "'It may

determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the

motion; or it may conduct an evidentiary hearing on the merits of the motion.'" *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981)); *see also Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 187 (Bankr. S.D.N.Y. 2018) (same).

"Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, legally sufficient allegations of jurisdiction." *Dorchester Fin.*, 722 F.3d at 84–85 (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)); *Picard v. Fairfield Greenwich Grp.* (*In re Fairfield Sentry Ltd.*), 627 B.R. 546, 565 (Bankr. S.D.N.Y. 2021) (same). At the pre-discovery stage, the allegations need not be factually supported. *See Dorchester Fin.*, 722 F.3d at 85 (explaining that an averment of facts is necessary only after discovery).

In order to be subjected to personal jurisdiction in the United States, due process requires that a defendant have sufficient minimum contacts with the forum in which defendant is sued "'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501, 516 (Bankr. S.D.N.Y. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). The pleadings and affidavits are to be construed "'in the light most favorable to the plaintiffs, resolving all doubts in their favor.'" *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010) (quoting *Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008)); *BNP Paribas S.A.*, 594 B.R. at 187.

> The Supreme Court has set out three conditions for the exercise of specific jurisdiction over a nonresident defendant. First, the defendant must have purposefully availed itself of the privilege of conducting activities within the forum State or have purposefully directed its conduct into the forum State. Second, the plaintiff's claim must arise out of or relate to the defendant's forum

conduct. Finally, the exercise of jurisdiction must be reasonable under the circumstances.

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (cleaned up).

**Purposeful Availment**

"[M]inimum contacts . . . exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 82 (2d Cir. 2018). "Although a defendant's contacts with the forum state may be intertwined with its transactions or interactions with the plaintiff or other parties, a defendant's relationship with a third party, standing alone, is an insufficient basis for jurisdiction." *U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (cleaned up). "It is insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff with the forum to establish specific jurisdiction." *Id.*

The UBS PJ Defendants argue that the Trustee has not alleged that they have sufficient contacts with New York. (Mem. L. 11–14, ECF No. 289). The Complaint suggests otherwise.

UBSFSL

Defendant UBSFSL is a Luxembourg limited liability company. (Id. ¶ 70). UBSFSL performed the day-to-day tasks of LIF-USEP, acted as the feeder fund's administrative agent, and facilitated investments into New York via BLMIS. (*Id.*). In its role as administrator of the feeder fund, UBSFSL was "responsible for calculating LIF-USEP's . . . total market value of each share of the fund." (*Id.* ¶ 155). To do so, it received account statements and trade confirmations from BLMIS in New York via UBS SA. (*Id.* ¶ 154). "UBSFSL knew that its revenues were dependent on economic activity undertaken by BLMIS." (*Id.* ¶ 70). Fax and telephone records demonstrate communication between UBSFSL and BLMIS. (*Id.*).

UBSFSL worked closely together with M&B and Reliance with respect to LIF-USEP for the "sole purpose of directing investment into BLMIS in New York and profiting from that endeavor." (*Id.* ¶ 74). It coordinated with Defendant UBS SA for the latter to receive funds from investors and then transfer those funds into BLMIS in New York. (North Decl. Ex. 21, Operating Mem. at RIRSAI0001330–34, ECF No. 304) (outlining subscription and redemption procedures). UBSFSL had responsibility for keeping LIF-USEP's "accounting and the Fund's books," for preparing "annual accounts, reports and financial statements," and for acting as the liaison with the fund's auditor. (North Decl. Ex. 32, Central Admin. Agreement at LIFVAA0000788–89.)

The Complaint alleges that Defendant relied on information it received from BLMIS, without independent verification, to create records, thereby helping to conceal the fraud. (Am. Compl. ¶ 156, ECF No. 284). The fees that the Trustee seeks to recover were allegedly paid to UBSFSL due to these activities. UBSFSL intentionally avoided "any direct legal or contractual links to BLMIS or Madoff." (*Id.* ¶ 119) ("Neither [UBS SA] nor UBSFSL should ever enter into a direct contract with Bernard Madoff!!!").

UBSTPM

Defendant UBSTPM is a Luxembourg limited liability company. (*Id.* ¶ 71). It served as the feeder fund's portfolio manager from May 5006 to December 2008. (*Id.* ¶ 160). Defendant UBSTPM represented to Luxembourg's Commission de Surveillance du Secteur Financier "that it managed, administered, and monitored the fund's investment policies and restrictions." (*Id.*).

UBSTPM "performed a host of fundamental tasks for LIF-USEP, and facilitated LIF-USEP's massive BLMIS investment." (*Id.* ¶ 68). UBSTPM concealed the delegation of LIF-USEP to BLMIS. (*Id.* ¶ 161). The feeder fund's July 2006 prospectus states that UBSTPM was

"responsible for the management, the administration and the distribution of the Fund's assets but is allowed to delegate, under its supervision and control, all or part of these duties to third parties." (*Id.*).

These allegations are legally sufficient to constitute a prima facie showing of jurisdiction. *Dorchester Fin. Sec. Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 85 (2d. Cir. 2013). "[A]lthough physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State— either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact." *Walden v. Fiore*, 571 U.S. 277, 285 (2014). The UBS PJ Defendants "intentionally tossed a seed from abroad to take root and grow as a new tree in the Madoff money orchard in the United States and reap the benefits therefrom." *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501, 506 (Bankr. S.D.N.Y. 2012). Defendants' alleged contacts with New York are not random, isolated, or fortuitous.

**Arise out of or relate to the defendant's forum conduct**

As to the second prong, the suit must "arise out of *or relate to* the defendant's contacts with the forum." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, __ U.S. __, 141 S. Ct. 1017, 1026, 209 L. Ed. 2d 225 (2021) (emphasis in original). "[P]roof that a plaintiff's claim came about because of the defendant's in-state conduct" is not required. *Id.* at 1027. Instead, the court need only find "an affiliation between the forum and the underlying controversy." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) ("Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts

within the state are not the proximate cause of the plaintiff's injury.") (internal quotations omitted).

The Trustee is asserting subsequent transfer claims against UBS PJ Defendants for monies they received from the BLMIS feeder fund. (Am. Compl. ¶¶ 270–76). These allegations are directly related to their investment activities with BLMIS through LIF-USEP. *BNP Paribas S.A.*, 594 B.R. at 191 (finding that the redemption and other payments the defendants received as direct investors in a BLMIS feeder fund were the proximate cause of the injuries that the Trustee sought to redress and arose from the New York contacts such as sending subscription agreements to New York, wiring funds in U.S. dollars to New York, sending redemption requests to New York, and receiving redemption payments from a Bank of New York account in New York).

The suit is affiliated with the alleged in-state conduct. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

**Reasonableness**

Having found sufficient minimum contacts, the Court must determine if exercising personal jurisdiction over the UBS PJ Defendants is reasonable and "comport[s] with fair play and substantial justice." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985) (internal quotations omitted). Factors the Court may consider include the burden on the defendants, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies. *Id.* at 477.

The exercise of jurisdiction is reasonable. Defendants are not burdened by this litigation. Defendants actively participated in this Court's litigation for over twelve years. (*See* Mot. to

Withdraw Reference, ECF No. 38). UBS PJ Defendants are represented by U.S. counsel and have continually associated with other New York-based Defendants. The forum and the Trustee both have a strong interest in litigating BLMIS adversary proceedings in this Court. *Picard v. Maxam Absolute Return Fund, L.P. (In re BLMIS)*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011), *aff'd*, 474 B.R. 76 (S.D.N.Y. 2012); *Picard v. Chais (In re BLMIS)*, 440 B.R. 274, 278 (Bankr. S.D.N.Y. 2010); *Picard v. Cohmad Sec. Corp. (In re BLMIS)*, 418 B.R. 75, 82 (Bankr. S.D.N.Y. 2009); *Picard v. Fairfield Greenwich Grp., (In re Fairfield Sentry Ltd.*), 627 B.R. 546, 568 (Bankr. S.D.N.Y. 2021); *see also In re Picard*, 917 F.3d 85, 103 (2d Cir. 2019) ("The United States has a compelling interest in allowing domestic estates to recover fraudulently transferred property.").

By alleging UBS PJ Defendants intentionally targeted their activities at BLMIS, the Trustee has met his burden of alleging jurisdiction as to each subsequent transfer that originated with BLMIS. As recognized by the Second Circuit, "[w]hen these [subsequent transfer] investors chose to buy into feeder funds that placed all or substantially all of their assets with Madoff Securities, they knew where their money was going." *In re Picard*, 917 F.3d 85, 105 (2d Cir. 2019). UBS PJ Defendants were instrumental in the creation of a BLMIS feeder fund, misled regulators, and brought new capital in to perpetuate the fraud. (Am. Compl. ¶¶ 70–74, 155–63). The Trustee has made a prima facie showing of personal jurisdiction.

**12(b)(6) standard**

"To survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). The claim is facially plausible when a plaintiff pleads facts that allow the Court to draw a "reasonable inference that the defendant is liable for the misconduct

alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."). In deciding a motion to dismiss, the Court should assume the factual allegations are true and determine whether, when read together, they plausibly give rise to an entitlement of relief. *Iqbal*, 556 U.S. at 679. "And, of course, a well-pl[ed] complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556.

In deciding the motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A complaint is "deemed to include any written instrument attached to it as an exhibit[,] . . . documents incorporated in it by reference[,]" and other documents "integral" to the complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (citations omitted). A document is "integral" to a complaint when the plaintiff has "actual notice" of the extraneous information and relied on it in framing the complaint. *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (citing *Chambers*, 282 F.3d at 153).

While the Trustee must allege that the initial transfers from BLMIS to a feeder fund are avoidable, he is not required to avoid the transfers received by the initial transferees before asserting an action against subsequent transferees. *IBT Int'l Inc. v. Northern (In re Int'l Admin*

*Servs., Inc.*), 408 F.3d 689, 706-07 (11th Cir. 2005). The Trustee is free to pursue any of the

immediate or mediate transferees, and nothing in the statute requires a different result. *IBT Int'l,*

*Inc. v. Northern* (*In re Int'l Admin. Servs., Inc.*), 408 F.3d 689, 706–07 (11th Cir. 2005).

**The Safe Harbor does not bar the avoidance of the Initial Transfers to the Feeder Funds**

Defendants have raised the "safe harbor" defense, found in § 546(e), to the Trustee's

allegations. (Mem. L. 15, ECF No. 289). Section 546(e) is referred to as the safe harbor because

it protects a transfer that is a "settlement payment ... made by or to (or for the benefit of) a ...

financial institution [or] financial participant," or that is "made by or to (or for the benefit of) a ...

financial institution [or] financial participant ... in connection with a securities contract." 11

U.S.C. § 546(e). By its terms, the safe harbor is a defense to the avoidance of the Initial

Transfers—those transfers from BLMIS to the Feeder Fund Defendants. *Picard v. BNP Paribas*

*S.A.* (*In re BLMIS*), 594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018). As subsequent transferees,

Defendants are also entitled to raise a § 546(e) defense against Trustee's recovery of the initial

transfer funds. *Picard v. Fairfield Inv. Fund* (*In re BLMIS*), No. 08-01789 (CGM), Adv. No. 09-

01239 (CGM), 2021 WL 3477479, at *3 (Bankr. S.D.N.Y. Aug. 6, 2021). To the extent that the

safe harbor bars the Trustee from collecting the initial transfer, he would also be barred from

collecting any subsequent transfers.

In *Fishman*, the Court of Appeals for the Second Circuit determined that, in many of the

Trustee's avoidance actions, § 546(e) applied because BLMIS' transfers to its customers

qualified as payments made "in connection with" securities contracts between BLMIS and its

customers. *See Picard v. Ida Fishman Recoverable Trust (In re BLMIS)*, 773 F.3d 411, 422 (2d

Cir. 2014). However, the safe harbor does not apply, by its plain terms, to transfers where the

transferee is complicit in BLMIS' fraud. *Picard v. Multi-Strategy Fund Ltd. (In re BLMIS)*, No.

22-CV-06502 (JSR), 2022 WL 16647767, at *7 (S.D.N.Y. Nov. 3, 2022).  This is because "any

transferee who knew the transfers it received from Madoff Securities contained only stolen

proceeds also knew those transfers were neither settlement payments [n]or transfers in

connection with a security agreement" and therefore, § 546(e) cannot apply.[2]  *Id.*

> The safe harbor was intended, among other things, to promote the reasonable
> expectations of legitimate investors.  If an investor knew that BLMIS was not
> actually trading securities, he had no reasonable expectation that he was signing a
> contract with BLMIS for the purpose of trading securities for his account.  In that
> event, the Trustee can avoid and recover preferences and actual and constructive
> fraudulent transfers to the full extent permitted under state and federal law.

> *Picard v. Legacy Capital Ltd. (In re BLMIS)*, 548 B.R. 13, 28 (Bankr. S.D.N.Y. 2016)

(internal citations omitted), *vacated and remanded on other grounds, Picard v. Citibank, N.A.* (*In

re BLMIS*), 12 F.4th 171 (2d Cir. 2021)).  By holding that the affirmative defense provided by §

546(e) is not applicable in situations such as the one alleged here, "sham" securities contracts do

not prevent the Trustee from clawing back complicit parties' ill-gotten gains.  The district court

has already determined that "those defendants who claim the protections of Section 546(e)

through a Madoff Securities account agreement but who actually knew that Madoff Securities

was a Ponzi scheme are not entitled to the protections of the Section 546(e) safe harbor, and their

motions to dismiss the Trustee's claims on this ground must be denied."  *Cohmad*, No. 12 MC

115(JSR), 2013 WL 1609154, at *10 (S.D.N.Y. Apr. 15, 2013).

This Court is powerless to reconsider this issue, agrees with the district court's reasoning,

and finds the district court's holding consistent with *dicta* set forth by the Court of Appeals for

the Second Circuit.  *See Picard v. Ida Fishman Revocable Trust* (*In re Bernard L. Madoff Inv.*

---

[2] While this is sometimes referred to as the "knowledge exception" to the safe harbor, "*Cohmad* did not carve out any atextual but equitable exception to an otherwise applicable Section 546(e) defense; rather, it simply concluded that, in circumstances in which a transferee was complicit in Madoff Securities' fraud, Section 546(e) did not apply as a matter of its express terms."  *Picard v. Multi-Strategy Fund Ltd. (In re BLMIS)*, No. 22-CV-06502 (JSR), 2022 WL 16647767, at *7 (S.D.N.Y. Nov. 3, 2022).

*Sec. LLC*), 773 F.3d 411, 420 (2d Cir. 2014) ("The clawback defendants, having every reason to believe that BLMIS was actually engaged in the business of effecting securities transactions, have every right to avail themselves of all the protections afforded to the clients of stockbrokers, including the protection offered by § 546(e).").

**Defendants' Actual Knowledge that BLMIS was Not Trading Securities**

The Trustee seeks recovery of initial transfers made within two years of the filing date. (Am. Compl. ¶ 266) ("During the two years preceding the Filing Date, BLMIS made transfers to or for the benefit of LIF-USEP in the amount of at least $498,300,000 . . . ."). Section 546(e) does not apply to the avoidance under § 548(a)(1)(A) of a transfer made within two years before the filing date. 11 U.S.C. § 546(e). The Initial Transfers are recoverable pursuant to § 550(a)(1).

Nevertheless, the Trustee has pleaded sufficient allegations of the actual knowledge that no securities were being traded. (Am. Compl. ¶¶ 100–29). The allegations that Defendants were complicit in BLMIS's fraud prevents the Court from dismissing the case on account of the Defendants' affirmative § 546(e) defense. The Trustee has alleged that LIF-USEP was aware of BLMIS's impossible trading activity and performance. (*Id.* ¶ 3) ("[T]he members of the network received evidence of BLMIS's fraud and shared that information among themselves. They thus willingly participated in Madoff's fraud throughout LIF-USEP's existence. And they profited from the fraud, receiving fraudulent transfers of customer property that the Trustee now seeks to recover through this action.).

Defendants are not natural persons and, as such, act only through "the instrumentality of their officers or other duly authorized agents." *45 John Lofts, LLC v. Meridian Capital Grp., LLC* (*In re 45 John Lofts, LLC*), 599 B.R. 730, 743 (Bankr. S.D.N.Y. 2019). An agent's

knowledge and acts are imputed to a corporate defendant.  *Id.*; (Am. Compl. ¶ 257–263) (alleging imputation of knowledge).

The Defendants and Manuel Echeverría are agents or officers of LIF-USEP with knowledge that can be imputed to LIF-USEP.  (Am. Compl. ¶¶ 262–63); (*id.* ¶ 136) ("UBS SA was, by law, responsible for both the safekeeping and the supervision of the fund's assets."); (*see also id.* ¶ 98) (showing a chart of directors and other officers of LIF-USEP and the Defendants). Their knowledge of BLMIS' fraud can be imputed to the feeder funds.

In the Complaint, the Trustee has alleged that UBS knew Madoff's returns were "impossible" by the time that LIF-USEP was established.  (*Id.* ¶ 6); (*Id.* ¶ 124) ("[A]s early as 2002 at least one UBS affiliate noted that '[t]he fund seems to do very well, but there are voices in the industry warning because generating such consistent returns with such a strategy is more or less impossible.'"); (Id. ¶ 126) ("Assessing BLMIS again in 2004—the same year that M&B, Echeverría, and UBS conceived LIF-USEP as a BLMIS feeder fund—one UBS subsidiary reiterated its prior conclusion that 'it would be IMPOSSIBLE to generate the returns that [Madoff] has produced since 1990.'").

UBS assisted Madoff in evading applicable laws and regulations.  (*Id.* ¶¶ 130–63).  UBS SA knew that they had no way of verifying whether BLMIS had any assets.  (*Id.* ¶¶ 147).  UBS removed all references to Madoff from UBS audit reports.  (*Id.* ¶ 227).  UBS set up an entire structure to protect LIF-USEP and BLMIS and evade regulators who might discover the fraud. (*Id.* ¶ 142).

Here, the Trustee has sufficiently plead the feeder fund had actual knowledge that BLMIS was not trading securities, which makes the safe harbor inapplicable by its express terms.

*Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*), No. 22-CV-06502 (JSR), 2022 WL 16647767,

at *7 (S.D.N.Y. Nov. 3, 2022).

### Whether BLMIS's Initial Transfers Are Avoidable as Intentionally Fraudulent Conveyances?

In relevant part, § 548(a)(1)(A) allows the Trustee to avoid any transfer made within two

years before the filing date of this SIPA action, if BLMIS made the transfer with "actual intent to

hinder, delay, or defraud."  11 U.S.C. § 548(a)(1)(A).  Defendants argue that BLMIS' initial

transfers to the Feeder Fund Defendants, made within two years of the SIPA filing date, are not

avoidable because the Trustee has failed to plead BLMIS' actual fraudulent intent with respect to

each transfer and that the Ponzi scheme presumption cannot be used to plead BLMIS' actual

fraudulent intent.  (Mem. L. 24–27, ECF No. 289).

Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the

circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a

person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

> Where the actual fraudulent transfer claim is asserted by a bankruptcy trustee,
> applicable Second Circuit precedent instructs courts to adopt a more liberal view
> since a trustee is an outsider to the transaction who must plead fraud from second-
> hand knowledge. Moreover, in a case such as this one, where the Trustee's lack of
> personal knowledge is compounded with complicated issues and transactions that
> extend over lengthy periods of time, the trustee's handicap increases, and even
> greater latitude should be afforded.

*Picard v. Cohmad Secs. Corp.,* (*In re BLMIS*), 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011) (cleaned

up).

Because the Trustee has pleaded that BLMIS operated a Ponzi scheme, the Trustee's

burden of pleading actual fraudulent intent is satisfied.  (Am. Compl. ¶¶ 38, 61–62); (*id.* ¶ 24) (

Madoff pleaded guilty and admitted he operated a Ponzi scheme through BLMIS).  The "Ponzi

scheme presumption" allows courts to presume actual intent to defraud on part of the operator of

the Ponzi scheme. *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008) ("The mere existence of

a Ponzi scheme is sufficient to establish actual intent to defraud."). In this case, the Ponzi

scheme presumption allows the Court to presume that BLMIS made the initial transfers with

actual intent to defraud because Madoff has admitted to operating a Ponzi scheme.

The mere existence of a Ponzi scheme "demonstrates actual intent as matter of law

because transfers made in the course of a Ponzi scheme could have been made for no purpose

other than to hinder, delay or defraud creditors." *Bear Stearns Secs. Corp. v. Gredd* (*In re

Manhattan Inv. Fund Ltd.*), 397 B.R. 1, 8 (S.D.N.Y. 2007). The "Ponzi scheme presumption"

makes perfect sense in cases such as this one. BLMIS had no legitimate assets and therefore

every transfer made by BLMIS was made with actual intent to defraud in order to ensure that

Ponzi scheme would survive.

The Trustee has pleaded that BLMIS operated a Ponzi scheme and as such, BLMIS'

actual fraudulent intent is presumed via the Ponzi scheme presumption. (Am. Compl. ¶¶ 1, 24–

28, 38, 287–89). Intent to defraud is established as debtor operated a Ponzi scheme. *Picard v.

Cohen*, Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296, at *5 (Bankr. S.D.N.Y. Apr. 25,

2016) (citing *Omnibus Good Faith Decision*, 531 B.R. at 471) ("the Trustee is entitled to rely

on the Ponzi scheme presumption pursuant to which all transfers are deemed to have been made

with actual fraudulent intent"); *Picard v. Cohmad Sec. Corp.*, 454 B.R. 317, 330 (Bankr.

S.D.N.Y. 2011) ("the fraudulent intent on the part of the debtor/transferor . . . is established as a

matter of law by virtue of the 'Ponzi scheme presumption'"). That BLMIS operated as a Ponzi

scheme is well-established and the Court relies on earlier findings of same and holds that the

Trustee has met its burden of pleading BLMIS' actual intent on this issue. *See Picard v. Legacy

Capital Ltd.*, 603 B.R. 682, 688-93 (Bankr. S.D.N.Y. 2019) (discussing in detail that BLMIS

was a Ponzi scheme and why the Trustee is permitted to rely on the Ponzi scheme presumption

to prove intent as a matter of law); *see also Bear Stearns Secs. Corp. v. Gredd (In re Manhattan*

*Inv. Fund Ltd.)*, 397 B.R. 1, 11 (S.D.N.Y. 2007) ("[T]he Ponzi scheme presumption remains the

law of this Circuit.").

The Ponzi scheme presumption saves the Trustee and the courts time and resources by

presuming that each transfer was made with actual fraudulent intent.  Without the presumption,

Defendants would not be "off-the-hook" for the two-year transfers because the Trustee would

meet (and, in this case, has met) his pleading burden by pleading the "badges of fraud" with

respect to BLMIS.

> Badges of fraud include (1) the lack or inadequacy of consideration; (2) the
> family, friendship or close associate relationship between the parties; (3) the
> retention of possession, benefit or use of the property in question; (4) the financial
> condition of the party sought to be charged both before and after the transaction in
> question; (5) the existence or cumulative effect of a pattern or series of
> transactions or course of conduct after the incurring of debt, onset of financial
> difficulties, or pendency or threat of suits by creditors; (6) the general chronology
> of the event and transactions under inquiry.

*See Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582-83 (2d Cir. 1983).  The "concealment

of facts and false pretenses by the transferor" is also a circumstance from which courts have

inferred intent to defraud.  *Id.* at 1582 (quoting 4 *Collier on Bankruptcy* ¶ 548.02[5] at 548–34 to

38 (L. King 15th ed. 1983)). The existence of several badges can "constitute conclusive evidence

of an actual intent to defraud." *Kirschner v. Fitzsimons (In re Tribune Co. Fraudulent*

*Conveyance Litig.)*, No. 11-md-2296 (RJS), 2017 WL 82391, at *13 (S.D.N.Y. Jan. 6, 2017)

(citation omitted); *Picard v. Nelson (In re BLMIS)*, 610 B.R. 197, 235 (Bankr. S.D.N.Y. 2019).

BLMIS' actual fraudulent intent is well-pleaded in the Complaint.  (Am. Compl. ¶¶ 35–

62).  The Court need not infer intent to defraud because Madoff has admitted that he had actual

intent to defraud when he admitted under oath that he operated a Ponzi scheme.  (*Id.* ¶ 168–256).

The Trustee has alleged that "BLMIS's website omitted the I[nvestment] A[dvisory] Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register." (*Id.* ¶ 35). "For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its I[nvestment] A[dvisory] Business. (*Id.* ¶ 36). BLMIS lied to the SEC in reports regarding the number of accounts it has and "grossly understated" the amount of assets under management. (*Id.* ¶ 37). BLMIS had no legitimate business operations and produced no profits or earnings. (*Id.* ¶ 38) "Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud." (*Id.*). BLMIS used its fraudulent investment advisory business to prop up its proprietary trading business, which also incurred significant losses. (*Id.* ¶ 43). "BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments." (*Id.* ¶ 46). "There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars." (*Id.* ¶ 51). "Madoff could not be using the SSC Strategy because his returns drastically outperformed the market. BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period. Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly). Such results were impossible if BLMIS had actually been implementing the SSC Strategy." (*Id.* ¶ 53). "There is

no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC

Strategy at The Depository Trust & Clearing Corporation, the clearing house for such

transactions, its predecessors, or any other trading platform on which BLMIS could have traded

securities." (*Id.* ¶ 59). Though unnecessary, the Trustee has sufficiently pleaded the badges of

fraud.

The Trustee has successfully pleaded badges 2, 3, 4, 5, and 6. The Trustee need not

plead all six badges of fraud to meet his burden of pleading actual fraudulent intent. *In re May*,

12 B.R. 618, 627 (N.D. Fla. 1980) ("Such indicators or badges, when established either

singularly, but more often in combination, may justify the inference of the requisite intent to

hinder, delay or defraud creditors.").

## BLMIS Customer Property

Defendants argue that the Complaint fails to plausibly allege that the subsequent transfers

made to them by the LIF-USEP consisted of customer property. (Mem. L. 31, ECF No. 289).

Rule 8(a) governs the Trustee's pleading burden and a short and plain statement that the pleader

is entitled to relief is all that is required. Fed. R. Civ. P. 8(a). This standard of pleading is meant

to ensure that the defendant has proper notice of the claim, while recognizing the limitations a

plaintiff may have in setting out each detail of the claim before discovery. *In re Enron Corp.*,

No. 01-16034 AJG, 2006 WL 2400369, at *4 (Bankr. S.D.N.Y. May 11, 2006). In a subsequent

transfer claim, this means only that a defendant must be adequately apprised of the subsequent

transfers that the Trustee seeks to recover. *Picard v. Cohmad* (*In re BLMIS*), 454 B.R. 317, 340

(Bankr. S.D.N.Y. 2011) ("*Cohmad II*"). In the Complaint, the Trustee provides the Defendants

with the "who, when, and how much" of the purported transfers. *Cohmad II*, 454 B.R. at 340;

(Am. Compl. ¶¶ 270–76).

271. Based on the Trustee's investigation to date, the UBS Defendants received at least $18,537,826 million in subsequent transfers from LIF-USEP:

a.   UBS SA received at least $5,162,211 in fees from LIF-USEP for serving as LIF-USEP's official custodian from September 2005 to December 2008, and received another $291,368 in fees for serving as LIF-USEP's official manager from September 2005 through at least April 2006.

b.   UBSFSL received at least $747,560 in fees from LIF-USEP for serving as LIF-USEP's official administrator from September 2005 to December 2008.

c.   UBSTPM received at least $10,590,437 in fees from LIF-USEP for serving as LIF-USEP's official manager from May 2006 to December 2008.

(*Id.* ¶ 271).

The Trustee has alleged that the LIF-USEP sole business was investing with BLMIS. (*Id.* ¶ 18) ("LIF-USEP's sole purpose was to direct investments into BLMIS in New York. Thus, the ultimate source of profit and/or revenue, for all of the Defendants in this action . . . ."). The feeder fund received hundreds of millions of dollars in initial transfers of customer property from BLMIS. (*Id.* ¶ 266) ("BLMIS made transfers to or for the benefit of LIF-USEP in the amount of at least $498,300,000. . . ."). Any and all subsequent transfers made from the feeder fund to Defendants are very likely comprised of BLMIS customer property.

  As has previously been stated by this Court,

the Trustee is an outsider to these transactions and will need discovery to identify the specific subsequent transfers by date, amount and the manner in which they were effected. The Moving Defendants are a group of interrelated individuals and entities .... Whether they additionally received Subsequent Transfers of BLMIS funds from one another is a question to which they, and they alone, have the requisite information to respond.

*Picard v. Mayer (In re BLMIS)*, No. 08-01789, Adv. No. 20-01316, 2021 WL 4994435, at *5 (Bankr. S.D.N.Y. Oct. 27, 2021).

These allegations provide more than enough detail to apprise Defendants of the subsequent transfers the Trustee is seeking to collect.

**Good Faith**

Defendants raise the affirmative defense of good faith, arguing that the "Trustee may not recover from a subsequent transferee who took for value, in good faith, and without knowledge of the voidability of the transfer."  (Mem. L. 27, ECF No. 289).

    *i.*    *For Value*

The "value" that a subsequent transferee must provide is "merely consideration sufficient to support a simple contract, analogous to the 'value' required under state law to achieve the status of a bona fide purchaser for value."  *Picard v. Legacy Capital Ltd.* (*In re BLMIS*), 548 B.R. 13, 37 (Bankr. S.D.N.Y. 2016) (citation omitted); *accord Enron Corp. v. Ave. Special Situations Fund II, L.P.* (*In re Enron Corp.*), 333 B.R. 205, 236 (Bankr. S.D.N.Y. 2005).  In addition, the "value" element under § 550(b)(1) looks to what the transferee gave up rather than what the transferor received.

Defendant argues that "the UBS Defendants are alleged to have provided services to LIF-USEP" which constitute value.  (Mem. L. 28, ECF No. 289).  This Court has found that, where the Complaint alleges that "Defendants received fees for pretending to provide services, which they knew to be done by BLMIS," the services do not satisfy the value requirement.  *Picard v. UBS AG*, Adv. Pro. No. 10-04285 (CGM), 2022 WL 17968924, at *17 (Bankr. S.D.N.Y. Dec. 27, 2022).

The Complaint shows that the Defendants received fees for pretending to provide services that were performed by BLMIS.  (*Id.* ¶ 159) ("The net effect of the operating procedures put in place for LIF-USEP was to allow UBS SA and UBSFSL, two sophisticated financial institutions that appeared to the public to be directly involved in the operation of LIF-USEP, to earn fees for serving in oversight roles that actually provided no real oversight or protection for

LIF-USEP's assets, and to allow BLMIS the freedom to manipulate reports as needed to perpetuate the Ponzi scheme."); (*id.* ¶ 161) ("After UBSTPM became LIF and LIF-USEP's management company, UBS continued to conceal the delegation of the fund's management to BLMIS.").  The "value" defense is not asserted on the face of the Complaint.

"Value" is Defendant's burden to plead and prove.  *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 198 (Bankr. S.D.N.Y. 2018).  Whether Defendants gave value is a question of fact to be resolved either at the summary judgment stage or at trial.  *Picard v. Fairfield Inv. Fund (In re BLMIS)*, No. 08-01789 (CGM), Adv Pro. No. 09-01239 (CGM), 2021 WL 3477479, at *9 (Bankr. S.D.N.Y., Aug. 6, 2021).

ii.    *Good Faith*

Where, in light of surrounding circumstances, a transferee should have known of the debtor's precarious financial condition, the transferee will be deemed to have taken in bad faith, unless an investigation into the debtor's financial condition actually discloses no reason to suspect financial trouble.  2 Bankruptcy Desk Guide § 19:105.  The District Court recently explained that good faith is a fact-intensive inquiry that almost always requires a trial: "[t]he Second Circuit made clear . . . that the inquiry notice standard requires a 'fact-intensive inquiry to be determined on a case-by-case basis, which naturally takes into account the disparate circumstances of differently-situated transferees.'"  *In re BLMIS*, No 20-cv-02586(CM), 2022 WL 1304589, at *3 (S.D.N.Y. May 2, 2022) (citing *Picard v. Citibank, N.A.* (*In re BLMIS*), 12 F.4th 171 (2d Cir. 2021), cert. denied No. 21-1059 (Feb. 28, 2022).  And that "such a fact-based determination can only be made based on the entirety of the factual record after discovery . . . ."  *Id.* (internal quotation omitted).

The Complaint alleges that the Defendants participated with BLMIS in the fraud. (Am. Compl. ¶ 3); (*id.* ¶ 18) ("All of the Defendants together engaged in an effort to direct investor funds into New York via BLMIS and to profit therefrom."). The burden of proving good faith falls squarely on Defendant, and this Court cannot make a determination on Defendant's affirmative defense until after a fact-intensive inquiry. Discovery is required on this issue.

      *iii.*     *Knowledge of Avoidability*

As has been stated numerous times, the Complaint alleges that the Defendants knew of the fraud. (Am. Compl. ¶¶ 116–256).

Good faith is linked with whether one had knowledge of the voidability of the transfer. *Picard v. Citibank, N.A.* (*In re BLMIS*), 12 F.4th 171, 189 (2d Cir. 2021) ("[A] transferee does not act in good faith when he has sufficient actual knowledge to place him on inquiry notice of the debtor's possible insolvency."), *cert. denied sub nom. Citibank, N.A. v. Picard*, 212 L. Ed. 2d 217, 142 S. Ct. 1209 (2022). Having determined that "good faith" cannot be found on the face of a complaint, the Court must deny the Defendants' motion on this element. Additionally, § 550(b)(1) provides a defense to recovery making lack of knowledge Defendant's burden to plead and prove. It is a fact-intensive inquiry that requires a three-step inquiry into 1) what Defendants subjectively knew; 2) "whether these facts put [them] on inquiry notice of the fraudulent purpose behind a transaction—that is, whether the facts the transferee[s] knew would have led a reasonable person in [their] position to conduct further inquiry into a debtor-transferor's possible fraud; and 3) whether "diligent inquiry by [Defendants] would have discovered the fraudulent purpose of the transfer." *Id.* at 192.

It is not appropriate for the Court to resolve these factual issues at this stage of the litigation.

## <u>Conclusion</u>

For the foregoing reasons, the UBS Defendants' motion to dismiss is denied. The Trustee shall submit a proposed order within fourteen days of the issuance of this decision, directly to chambers (via E-Orders), upon not less than two days' notice to all parties, as required by Local Bankruptcy Rule 9074-1(a).

/s/ Cecelia G. Morris
_____
**Hon. Cecelia G. Morris**
**U.S. Bankruptcy Judge**



**Dated: October 10, 2023**
**Poughkeepsie, New York**