**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES INVESTOR PROTECTION CORPORATION, | No. 08-01789 (CGM) |
| Plaintiff-Applicant, | SIPA LIQUIDATION |
| v. | (Substantively Consolidated) |
| BERNARD L. MADOFF INVESTMENT SECURITIES LLC, | |
| Defendant. | |

In re:

BERNARD L. MADOFF,

        Debtor.

| | |
|---|---|
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC, | |
| Plaintiff, | Adv. Pro. No. 10-05311 (CGM) |
| v. | |
| UBS EUROPE SE (f/k/a UBS (LUXEMBOURG) S.A.), UBS FUND SERVICES (LUXEMBOURG) S.A., UBS THIRD PARTY MANAGEMENT COMPANY S.A., M&B CAPITAL ADVISERS SOCIEDAD DE VALORES, S.A., RELIANCE INTERNATIONAL RESEARCH LLC, LUXEMBOURG INVESTMENT FUND AND LUXEMBOURG INVESTMENT FUND U.S. EQUITY PLUS, as represented by their Liquidators MAÎTRE ALAIN RUKAVINA and PAUL LAPLUME, MAÎTRE ALAIN RUKAVINA and PAUL LAPLUME, in their capacities as liquidators and representatives of LUXEMBOURG INVESTMENT FUND AND LUXEMBOURG INVESTMENT FUND U.S. EQUITY PLUS, | |
| Defendants. | |

**MEMORANDUM DECISION DENYING RELIANCE INTERNATIONAL RESEARCH
LLC'S MOTION TO DISMISS**

<u>**A**</u> **P P** <u>**E A**</u> **R A** <u>**N C E**</u> <u>**S**</u> **:**

Seward & Kissel LLP
One Battery Park Plaza
New York, NY 10004
*Attorneys for Defendant Reliance International Research LLC*
By:     Mark J. Hyland
          Carmella R. O'Hanlon

BAKER HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff Investment Securities LLC and the Chapter 7 Estate of
Bernard L. Madoff*
By:     Oren J. Warshavsky
          David J. Sheehan
          Gonzalo Zeballos
          Tatiana Markel

OF COUNSEL: BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
By:     Benjamin Pergament
          Robertson Beckerlegge
          Geoffrey A. North
          Michelle R. Usitalo

**CECELIA G. MORRIS**
**UNITED STATES BANKRUPTCY JUDGE**

          Pending before the Court is the motion of the Defendant, Reliance International Research

LLC ("RIR"), to dismiss the complaint of Irving Picard, the trustee ("Trustee") for the

liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") seeking to recover

subsequent transfers allegedly consisting of BLMIS customer property.  (Mot. Dismiss, ECF No.

295).  Defendant seeks dismissal for failure to "plausibly identify" transfers in connection with

payments by the feeder fund, LIF-USEP.  (Mem L., ECF No. 296).  RIR further joins in and incorporates by reference, the arguments made by the UBS Defendants in their motion to dismiss, regarding the "safe harbor" provision of the Bankruptcy Code, fraudulent intent, the purported Good Faith defense, and allegations of receipt of BLMIS customer property.  (*Id.* at 4).  For the reasons set forth herein, the motion to dismiss is denied in its entirety.

## <u>Jurisdiction</u>

This is an adversary proceeding commenced in this Court, in which the main underlying SIPA proceeding, Adv. Pro. No. 08-01789 (CGM) (the "SIPA Proceeding"), is pending.  The SIPA Proceeding was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities Exchange Commission v. Bernard L. Madoff Investment Securities LLC et al.*, No. 08-CV-10791, and has been referred to this Court.  This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and (e)(1), and 15 U.S.C. § 78eee(b)(2)(A) and (b)(4).

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (F), (H) and (O).  This Court has subject matter jurisdiction over these adversary proceedings pursuant to 28 U.S.C. §§ 1334(b) and 157(a), the District Court's Standing Order of Reference, dated July 10, 1984, and the Amended Standing Order of Reference, dated January 31, 2012.  In addition, the District Court removed the SIPA liquidation to this Court pursuant to SIPA § 78eee(b)(4), (*see* Order, Civ. 08– 01789 (Bankr. S.D.N.Y. Dec. 15, 2008) ("Main Case"), at ¶ IX (ECF No. 1)), and this Court has jurisdiction under the latter provision.  Personal jurisdiction has not been contested by the Defendant.

## Background

The Court assumes familiarity with the background of the BLMIS Ponzi scheme operated by Bernard L. Madoff ("Madoff") and its SIPA proceeding. *See Picard v. Citibank, N.A. (In re BLMIS),* 12 F.4th 171, 178–83 (2d Cir. 2021), *cert. denied sub nom. Citibank, N.A. v. Picard,* 142 S. Ct. 1209, 212 L. Ed. 2d 217 (2022).

This adversary proceeding was filed on December 7, 2010. (Compl., ECF[1] No. 1). The Trustee filed a second amended complaint on February 24, 2023 (the "Complaint"). (Am. Compl., ECF No. 284). Via the Complaint, the Trustee is seeking to recover transfers of customer property allegedly made by BLMIS to Defendant; the Trustee further seeks recovery of transfers made to UBS Europe SE (f/k/a UBS (Luxembourg) S.A.) ("UBS SA"), UBS Fund Services (Luxembourg) S.A. ("UBSFSL"), UBS Third Party Management Company S.A. ("UBSTPM," and together with UBS SA and UBSFSL, the "UBS Defendants") and M&B Capital Advisers Sociedad De Valores, S.A. ("M&B"). (*Id.* ¶¶ 270–76).

The Complaint alleges that Defendant was intimately involved in the formation of Luxembourg Investment Fund U.S. Equity Plus ("LIF-USEP"). (*Id.* ¶¶ 83, 94–95). LIF-USEP was a feeder fund of BLMIS which invested wholly with BLMIS in New York. (*Id.* ¶¶ 1–2, 65, 99, 126). The Complaint alleges that LIF-USEP was created to invest in BLMIS with full knowledge of BLMIS' fraud. (*Id.* ¶ 65) ("[LIF-USEP's] *raison d'être* was to invest with and profit from BLMIS's operations, which LIF-USEP and its agents knew took place in New York.").

Defendant was a part of the Reliance Group. (*Id.* ¶ 78). The Reliance Group was comprised of Defendant, Reliance Management (Gibraltar) Limited ("Reliance Group"), and

---

[1] Citations to this Court's electronic docket refer to the docket of adversary case number 10-05311 unless otherwise noted.

Reliance Management (BVI) (together, "Reliance").  (*Id.*).  Reliance "held itself out as a single business enterprise whose New York operations were essential to Reliance's ability to market and perform services for its clients."  (*Id.* ¶ 79).  These entities "used personnel interchangeably and often disregarded corporate formalities."  (*Id.* ¶ 80).  The Reliance entities used the same internet address, "through which Reliance held itself out as a single, undifferentiated whole."  (See *Id.* ¶ 82).  Defendant RIR was referred to as the "research entity" of Reliance.  (*Id.* ¶ 78).

The UBS Defendants were each wholly owned subsidiaries of UBS AG.  (*Id.* ¶ 73).  The Defendants and other subsidiaries of UBS AG market themselves as part of a "worldwide financial network" that is "based on 'the experience, know-how, and substantial resources provided by the UBS Group as a whole.'"  (*Id.*).

Defendant UBS SA is a "Societas Europaea" incorporated in Germany, is registered with the Register of Commerce of Frankfurt and has a registered office in Frankfurt am Main.  (*Id.* ¶ 69).  UBS SA was formally known as UBS (Luxembourg) SA before its merger and absorption into UBS Europe SE in December 2016.  (*Id.*).  UBS SA was "listed as LIF-USEP's custodian, main distributor, and main paying agent in the fund's prospectus."  (*Id.*).

Defendant UBSFSL is a Luxembourg limited liability company incorporated as a *société anonyme* and has a its registered office at in Luxembourg.  (*Id.* ¶ 70).  The Complaint alleges that UBSFSL acted as LIF-USEP's administrative agent while playing a "a critical role in LIF-USEP's operation, management, and servicing."  (*Id.*).  Defendant UBSFSL performed daily tasks of the feeder fund.  (*Id.*).

Defendant UBSTPM is a Luxembourg limited liability company incorporated as *a société anonyme* with registered office in Luxembourg.  (*Id.* ¶ 71).  UBSTPM allegedly managed and

administered the feeder fund, monitored investment policies and restrictions, and "was officially responsible for LIF-USEP's investment management decisions." (*Id.*).

The feeder fund's alleged knowledge of BLMIS's fraud centers on the relationship between Manuel Echeverría and Madoff. (*Id.* 257–63). Echeverría was the agent of LIF-USEP and of M&B with respect to LIF-USEP's investments with BLMIS. Prior to the creation of LIF-USEP, Echeverría had "been in charge of the Madoff relationship for Optimal U.S. Equity Fund . . . a $3.2 billion BLMIS feeder fund." (*Id.* ¶ 2). In this role, Echeverría "cultivated a relationship with Madoff and a network of Madoff-approved investment professionals." (*Id.*). Bernard Madoff "viewed Echeverría as one of his top European envoys and a source of new investment capital." (*Id.* ¶ 91).

The Complaint alleges that Echeverría brought together a group of well-connected investment professionals around Morenes and Botín, two principals of M&B, to establish LIF-USEP in 2005 as a feeder fund of BLMIS. (Am. Compl. ¶¶ 2,87). Echeverría had done so to "unlock an opportunity for direct BLMIS investment" that would get past the limits imposed by investing with other feeder funds. (*Id.* ¶¶ 88–89). Echeverría developed the architecture for LIF-USEP. (*Id.* ¶ 92). M&B was to serve as "the fund's distributor, signing a Consultancy and Exclusive Introducing Agreement with UBS SA." (*Id.*).

The Complaint alleges that Echeverría regularly communicated with Madoff in person, by telephone, and by fax regarding LIF-USEP's establishment and operation. (*Id.* ¶ 261) ("At least fifty times during LIF-USEP's existence, Echeverría communicated with Madoff, Reliance, or UBS on LIF-USEP's and M&B's behalf, in furtherance of the effort to expand BLMIS investment."). Echeverría "arranged for a meeting with Madoff and facilitated the opening of a BLMIS account for LIF-USEP." (*Id.* ¶ 93). He assembled service providers that would be

acceptable to regulators and to Madoff.  (*Id.* ¶ 94).  Knowing that Reliance, a firm headed by his

friend, Tim Brockman, sought access to a BLMIS feeder fund, Echeverría approached Brockman

about LIF-USEP.  (*Id.* ¶ 95).  Brockman then committed Reliance Gibraltar to serve as LIF-

USEP's official investment advisor.  (*Id.*).

Knowing that UBS had acted as a service provider for other BLMIS feeder funds,

Echeverría traveled with the director of M&B "to Luxembourg to meet with UBS SA about LIF-

USEP. As it had with Luxalpha, UBS signed on to serve as LIF's official sponsor, administrator,

and custodian."  (*Id.* ¶¶ 96–97).  UBS "agreed to stock LIF-USEP's board of directors with UBS

employees."  (*Id.* ¶ 98).  LIF-USEP's board of directors was stocked with UBS SA employees.

(Id. ¶¶ 98, 260).  "All five of LIF-USEP's directors were employees of UBS SA."  (*Id.* ¶ 98).

This architecture was in place when LIF-USEP was formed in August 2005.  (*Id.* ¶ 99).

Echeverría worked as M&B's and LIF-USEP's agent after the latter's formation and

carried out "a number of behind-the-scenes roles critical to the fund's success."  (*Id.* ¶ 100).  He

managed the "flow of subscription and redemption requests" while also making sure to not

trigger the "irritation of Madoff . . . with inopportune redemption requests." (*Id.*).

**Trustee's Complaint**

In his Complaint, the Trustee asserts four counts.  (Am. Compl. ¶¶ 284–308).  Counts one

and four are directed at LIF-USEP and against Luxembourg Investment Fund SICAV ("LIF")

the alleged umbrella fund of LIF-USEP.  (*Id.* ¶¶ 65, 284, 302).  Count two is directly solely

against LIF-USEP.  (Id. ¶ 291).  Via count three of the Complaint, the Trustee seeks to recover

transfers of BLMIS customer property that BLMIS made to LIF-USEP (the "Initial Transfers")

and were subsequently transferred to the RIR, the UBS Defendants, and M&B (the "Subsequent

Transferees").  (*Id.* ¶¶ 297–300).

**Initial Transfers**

According to the Complaint, "LIF-USEP maintained BLMIS account no. 1FR123." (*Id.*
¶ 264). LIF-USEP sent funds to BLMIS or to BLMIS's JPMorgan Chase in New York, Account
No. xxxxxxxxxx1703 (the "703 Account") "for application to the [1FR123] Account and the
purported conducting of trading activities." (*Id.* ¶ 265). Within two years of the filing date,
BLMIS allegedly made transfers to or for the benefit of LIF-USEP of at least $498.3 million.
(*Id.* ¶ 266). The Trustee is seeking to avoid and recover the initial transfers paid from BLMIS to
the LIF-USEP pursuant to 11 U.S.C. §§ 548, 550(a)(1) and to 15 U.S.C. § 78fff-2(c)(3). (*Id.* ¶
266).

**Subsequent Transfers**

Count three is asserted against RIR, the UBS Defendants and M&B. (Am. Compl. ¶
297). The Complaint alleges that LIF-USEP transferred some portion of the Initial Transfers to
each of the Subsequent Transferee Defendants "as payment for their alleged service of LIF-
USEP," thereby constituting subsequent transfers. (*Id.* ¶ 270). The Complaint alleges that the
UBS Defendants received at least $18,537,826 and that M&B received at least $9,803,268 in
subsequent transfers from the feeder fund. (*Id.* ¶¶ 271–72). "Based on the Trustee's
investigation to date, RIR received at least $4,324,482 in subsequent transfers from LIF-USEP."
(*Id.* ¶ 273

On May 5, 2023, Defendant filed a motion to dismiss the Complaint. (Mot. Dismiss,
ECF No. 295). In the motion to dismiss, Defendant argues that the Trustee has not plausibly
alleged that it received transfers from LIF-USEP. Defendant joins in the arguments made by the
UBS Defendants that § 546(e) of the Bankruptcy Code, known as the "the safe harbor" bars the
Trustee from recovering all alleged subsequent transfers from BLMIS to LIF-USEP made more

than two years before the petition date; that the Trustee has failed to allege actual fraudulent intent on the part of BLMIS; and that the Trustee has failed to plead that Defendant received customer property of BLMIS. (Mem. L., ECF No. 296); (*See* Mem. L. of UBS Defs., ECF No. 289). Defendant joins in and adopts the Good Faith defense against the recovery of subsequent transfers. (Mem. L., ECF No. 296). The Trustee has opposed the motion. (Opp'n, ECF No. 303). The parties waived oral argument on this motion. (Stip. and Order, ECF No. 312).

<u>Discussion</u>

**12(b)(6) standard**

"To survive a motion to dismiss, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). The claim is facially plausible when a plaintiff pleads facts that allow the Court to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."). In deciding a motion to dismiss, the Court should assume the factual allegations are true and determine whether, when read together, they plausibly give rise to an entitlement of relief. *Iqbal*, 556 U.S. at 679. "And, of course, a well-pl[ed] complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556.

In deciding the motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). A complaint is "deemed to include any written instrument attached to it as an exhibit[,] . . . documents incorporated in it by reference[,]" and other documents "integral" to the complaint. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (citations omitted). A document is "integral" to a complaint when the plaintiff has "actual notice" of the extraneous information and relied on it in framing the complaint. *DeLuca v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (citing *Chambers*, 282 F.3d at 153).

While the Trustee must allege that the initial transfers from BLMIS to a feeder fund are avoidable, he is not required to avoid the transfers received by the initial transferees before asserting an action against subsequent transferees. *IBT Int'l Inc. v. Northern (In re Int'l Admin Servs., Inc.)*, 408 F.3d 689, 706-07 (11th Cir. 2005). The Trustee is free to pursue any of the immediate or mediate transferees, and nothing in the statute requires a different result. *IBT Int'l, Inc. v. Northern* (*In re Int'l Admin. Servs., Inc.*), 408 F.3d 689, 706–07 (11th Cir. 2005).

**The Safe Harbor does not bar the avoidance of the Initial Transfers to the Feeder Funds**

Defendant joins in the UBS Defendants' raising of the "safe harbor" defense, found in § 546(e), to the Trustee's allegations. (Mem. L, ECF No. 296); (Mem. L. of UBS Defs. 15, ECF No. 289). Section 546(e) is referred to as the safe harbor because it protects a transfer that is a "settlement payment ... made by or to (or for the benefit of) a ... financial institution [or] financial participant," or that is "made by or to (or for the benefit of) a ... financial institution [or] financial participant ... in connection with a securities contract." 11 U.S.C. § 546(e). By its

terms, the safe harbor is a defense to the avoidance of the Initial Transfers—those transfers from BLMIS to the Feeder Fund Defendants. *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 197 (Bankr. S.D.N.Y. 2018). As subsequent transferees, Defendants are also entitled to raise a § 546(e) defense against Trustee's recovery of the initial transfer funds. *Picard v. Fairfield Inv. Fund* (*In re BLMIS*), No. 08-01789 (CGM), Adv. No. 09-01239 (CGM), 2021 WL 3477479, at *3 (Bankr. S.D.N.Y. Aug. 6, 2021). To the extent that the safe harbor bars the Trustee from collecting the initial transfer, he would also be barred from collecting any subsequent transfers.

In *Fishman*, the Court of Appeals for the Second Circuit determined that, in many of the Trustee's avoidance actions, § 546(e) applied because BLMIS' transfers to its customers qualified as payments made "in connection with" securities contracts between BLMIS and its customers. *See Picard v. Ida Fishman Recoverable Trust (In re BLMIS)*, 773 F.3d 411, 422 (2d Cir. 2014). However, the safe harbor does not apply, by its plain terms, to transfers where the transferee is complicit in BLMIS' fraud. *Picard v. Multi-Strategy Fund Ltd. (In re BLMIS)*, No. 22-CV-06502 (JSR), 2022 WL 16647767, at *7 (S.D.N.Y. Nov. 3, 2022). This is because "any transferee who knew the transfers it received from Madoff Securities contained only stolen proceeds also knew those transfers were neither settlement payments [n]or transfers in connection with a security agreement" and therefore, § 546(e) cannot apply.[2] *Id.*

> The safe harbor was intended, among other things, to promote the reasonable expectations of legitimate investors. If an investor knew that BLMIS was not actually trading securities, he had no reasonable expectation that he was signing a contract with BLMIS for the purpose of trading securities for his account. In that

---

[2] While this is sometimes referred to as the "knowledge exception" to the safe harbor, "*Cohmad* did not carve out any atextual but equitable exception to an otherwise applicable Section 546(e) defense; rather, it simply concluded that, in circumstances in which a transferee was complicit in Madoff Securities' fraud, Section 546(e) did not apply as a matter of its express terms." *Picard v. Multi-Strategy Fund Ltd. (In re BLMIS)*, No. 22-CV-06502 (JSR), 2022 WL 16647767, at *7 (S.D.N.Y. Nov. 3, 2022).

event, the Trustee can avoid and recover preferences and actual and constructive
fraudulent transfers to the full extent permitted under state and federal law.

*Picard v. Legacy Capital Ltd. (In re BLMIS)*, 548 B.R. 13, 28 (Bankr. S.D.N.Y. 2016)

(internal citations omitted), *vacated and remanded on other grounds, Picard v. Citibank, N.A.* (*In

re BLMIS*), 12 F.4th 171 (2d Cir. 2021)).  By holding that the affirmative defense provided by §

546(e) is not applicable in situations such as the one alleged here, "sham" securities contracts do

not prevent the Trustee from clawing back complicit parties' ill-gotten gains.  The district court

has already determined that "those defendants who claim the protections of Section 546(e)

through a Madoff Securities account agreement but who actually knew that Madoff Securities

was a Ponzi scheme are not entitled to the protections of the Section 546(e) safe harbor, and their

motions to dismiss the Trustee's claims on this ground must be denied."  *Cohmad*, No. 12 MC

115(JSR), 2013 WL 1609154, at *10 (S.D.N.Y. Apr. 15, 2013).

This Court is powerless to reconsider this issue, agrees with the district court's reasoning,

and finds the district court's holding consistent with *dicta* set forth by the Court of Appeals for

the Second Circuit.  *See Picard v. Ida Fishman Revocable Trust* (*In re Bernard L. Madoff Inv.

Sec. LLC*), 773 F.3d 411, 420 (2d Cir. 2014) ("The clawback defendants, having every reason to

believe that BLMIS was actually engaged in the business of effecting securities transactions,

have every right to avail themselves of all the protections afforded to the clients of stockbrokers,

including the protection offered by § 546(e).").

**Actual Knowledge that BLMIS was Not Trading Securities**

The Trustee seeks recovery of initial transfers made within two years of the filing date.

(Am. Compl. ¶ 266) ("During the two years preceding the Filing Date, BLMIS made transfers to

or for the benefit of LIF-USEP in the amount of at least $498,300,000 . . . .").  Section 546(e)

does not apply to the avoidance under § 548(a)(1)(A) of a transfer made within two years before the filing date. 11 U.S.C. § 546(e). The Initial Transfers are recoverable pursuant to § 550(a)(1).

The UBS Defendants argued in their motion to dismiss that the Amended Complaint, "fails to allege that they or LIF-USEP actually knew of the fraud" (Mem. L. of UBS Defs. at 3, ECF No. 289); (*see also id.* at 20). While it is not necessary for the Trustee to do so given that the Trustee "seeks only to avoid two-year transfers under 548(a)(1)(A)" (Opp'n at 50, ECF No. 303), the Trustee has pleaded sufficient allegations of the actual knowledge that no securities were being traded. (Am. Compl. ¶¶ 100–29). The allegations that the feeder funds were complicit in BLMIS's fraud prevents the Court from dismissing the case on account of the § 546(e) defense. The Trustee has alleged that LIF-USEP was aware of BLMIS's impossible trading activity and performance. (*Id.* ¶ 3) ("[T]he members of the network received evidence of BLMIS's fraud and shared that information among themselves. They thus willingly participated in Madoff's fraud throughout LIF-USEP's existence. And they profited from the fraud, receiving fraudulent transfers of customer property that the Trustee now seeks to recover through this action.").

Defendant is not a natural person and, as such, act only through "the instrumentality of their officers or other duly authorized agents." *45 John Lofts, LLC v. Meridian Capital Grp., LLC (In re 45 John Lofts, LLC)*, 599 B.R. 730, 743 (Bankr. S.D.N.Y. 2019). An agent's knowledge and acts are imputed to a corporate defendant. *Id.*; (Am. Compl. ¶ 257–263) (alleging imputation of knowledge).

The Subsequent Transferee Defendants and Manuel Echeverría are agents or officers of LIF-USEP with knowledge that can be imputed to LIF-USEP. (Am. Compl. ¶¶ 262–63); (*id.* ¶ 263) ("M&B, Reliance, and UBS were LIF-USEP's agents, and their conduct and willful

blindness to BLMIS's fraud is imputed to LIF-USEP."); (*see also id.* ¶ 98) (showing a chart of directors and other officers of LIF-USEP and the Defendants).  Defendant, along with the UBS Defendants and M&B, "were intertwined with respect to LIF and LIF-USEP, working closely together in creating and servicing LIF-USEP and expanding its BLMIS investment."  (*Id.* ¶ 257); (*see also Id.* ¶ 257) ("At all times, M&B, Reliance, and UBS dominated and controlled LIF-USEP. LIFUSEP never had any employees or office space, but rather listed a UBS address as its own and stocked its board with UBS employees. M&B, Reliance, and UBS operated the fund as a common enterprise, of which they were the constituent parts.").  Their knowledge of BLMIS' fraud can be imputed to the feeder funds.

In the Complaint, the Trustee has alleged that UBS knew Madoff's returns were "impossible" by the time that LIF-USEP was established.  (*Id.* ¶ 6); (*Id.* ¶ 124) ("[A]s early as 2002 at least one UBS affiliate noted that '[t]he fund seems to do very well, but there are voices in the industry warning because generating such consistent returns with such a strategy is more or less impossible.'"); (Id. ¶ 126) ("Assessing BLMIS again in 2004—the same year that M&B, Echeverría, and UBS conceived LIF-USEP as a BLMIS feeder fund—one UBS subsidiary reiterated its prior conclusion that 'it would be IMPOSSIBLE to generate the returns that [Madoff] has produced since 1990.'").

Defendants assisted Madoff in evading applicable laws and regulations.  (*Id.* ¶¶ 130–63).  UBS SA knew that they had no way of verifying whether BLMIS had any assets.  (*Id.* ¶¶ 147).  UBS removed all references to Madoff from UBS audit reports.  (*Id.* ¶ 227).  UBS set up an entire structure to protect LIF-USEP and BLMIS and evade regulators who might discover the fraud.  (*Id.* ¶ 142).

Following the creation of the feeder fund, Defendants "regularly communicated with Echeverría and Optimal personnel throughout LIF-USEP's existence." (*Id.* ¶ 173). One Reliance analyst "repeatedly attempted to raise concerns about BLMIS with . . . Justin Lowe, the head of RIR. He commented to Lowe, 'I am not trying to give you a heart attack . . . but my honest opinion is that [BLMIS] is extremely worrisome.'" (*Id.* ¶ 11). The analyst understood that, objectively, BLMIS "makes no sense." (*Id.*). "Despite being repeatedly presented with evidence of fraud, LIF-USEP invested hundreds of millions of dollars with BLMIS." (*Id.* ¶ 12).

To the extent that the Defendant argues lack of actual knowledge of fraud, the Trustee has sufficiently plead the feeder fund had actual knowledge that BLMIS was not trading securities, which makes the safe harbor inapplicable by its express terms. *Picard v. Multi-Strategy Fund Ltd.* (*In re BLMIS*), No. 22-CV-06502 (JSR), 2022 WL 16647767, at *7 (S.D.N.Y. Nov. 3, 2022).

## Whether BLMIS's Initial Transfers Are Avoidable as Intentionally Fraudulent Conveyances?

In relevant part, § 548(a)(1)(A) allows the Trustee to avoid any transfer made within two years before the filing date of this SIPA action, if BLMIS made the transfer with "actual intent to hinder, delay, or defraud." 11 U.S.C. § 548(a)(1)(A). Defendant joins in the UBS Defendants' argument that BLMIS' initial transfers to the feeder fund, made within two years of the SIPA filing date, are not avoidable because the Trustee has failed to plead BLMIS's actual fraudulent intent with respect to each transfer and that the Ponzi scheme presumption cannot be used to plead BLMIS' actual fraudulent intent. (Mem. L, ECF No. 296); (Mem. L. of UBS Defs. 24–27, ECF No. 289).

Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).

> Where the actual fraudulent transfer claim is asserted by a bankruptcy trustee, applicable Second Circuit precedent instructs courts to adopt a more liberal view since a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge. Moreover, in a case such as this one, where the Trustee's lack of personal knowledge is compounded with complicated issues and transactions that extend over lengthy periods of time, the trustee's handicap increases, and even greater latitude should be afforded.

*Picard v. Cohmad Secs. Corp.,* (*In re BLMIS*), 454 B.R. 317, 329 (Bankr. S.D.N.Y. 2011) (cleaned up).

Because the Trustee has pleaded that BLMIS operated a Ponzi scheme, the Trustee's burden of pleading actual fraudulent intent is satisfied.  (Am. Compl. ¶¶ 38, 61–62); (*id.* ¶ 24) ( Madoff pleaded guilty and admitted he operated a Ponzi scheme through BLMIS).  The "Ponzi scheme presumption" allows courts to presume actual intent to defraud on part of the operator of the Ponzi scheme.  *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008) ("The mere existence of a Ponzi scheme is sufficient to establish actual intent to defraud.").  In this case, the Ponzi scheme presumption allows the Court to presume that BLMIS made the initial transfers with actual intent to defraud because Madoff has admitted to operating a Ponzi scheme.

The mere existence of a Ponzi scheme "demonstrates actual intent as matter of law because transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors."  *Bear Stearns Secs. Corp. v. Gredd* (*In re Manhattan Inv. Fund Ltd.*), 397 B.R. 1, 8 (S.D.N.Y. 2007).  The "Ponzi scheme presumption" makes perfect sense in cases such as this one.  BLMIS had no legitimate assets and therefore every transfer made by BLMIS was made with actual intent to defraud in order to ensure that Ponzi scheme would survive.

The Trustee has pleaded that BLMIS operated a Ponzi scheme and as such, BLMIS' actual fraudulent intent is presumed via the Ponzi scheme presumption. (Am. Compl. ¶¶ 1, 24–28, 38, 287–89). Intent to defraud is established as debtor operated a Ponzi scheme. *Picard v. Cohen*, Adv. Pro. No. 10-04311 (SMB), 2016 WL 1695296, at *5 (Bankr. S.D.N.Y. Apr. 25, 2016) (citing *Omnibus Good Faith Decision*, 531 B.R. at 471) ("the Trustee is entitled to rely on the Ponzi scheme presumption pursuant to which all transfers are deemed to have been made with actual fraudulent intent"); *Picard v. Cohmad Sec. Corp.*, 454 B.R. 317, 330 (Bankr. S.D.N.Y. 2011) ("the fraudulent intent on the part of the debtor/transferor . . . is established as a matter of law by virtue of the 'Ponzi scheme presumption'"). That BLMIS operated as a Ponzi scheme is well-established and the Court relies on earlier findings of same and holds that the Trustee has met its burden of pleading BLMIS' actual intent on this issue. *See Picard v. Legacy Capital Ltd.*, 603 B.R. 682, 688-93 (Bankr. S.D.N.Y. 2019) (discussing in detail that BLMIS was a Ponzi scheme and why the Trustee is permitted to rely on the Ponzi scheme presumption to prove intent as a matter of law); *see also Bear Stearns Secs. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 11 (S.D.N.Y. 2007) ("[T]he Ponzi scheme presumption remains the law of this Circuit.").

The Ponzi scheme presumption saves the Trustee and the courts time and resources by presuming that each transfer was made with actual fraudulent intent. Without the presumption, Defendants would not be "off-the-hook" for the two-year transfers because the Trustee would meet (and, in this case, has met) his pleading burden by pleading the "badges of fraud" with respect to BLMIS.

> Badges of fraud include (1) the lack or inadequacy of consideration; (2) the family, friendship or close associate relationship between the parties; (3) the retention of possession, benefit or use of the property in question; (4) the financial condition of the party sought to be charged both before and after the transaction in

question; (5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors; (6) the general chronology of the event and transactions under inquiry.

*See Salomon v. Kaiser (In re Kaiser)*, 722 F.2d 1574, 1582-83 (2d Cir. 1983). The "concealment of facts and false pretenses by the transferor" is also a circumstance from which courts have inferred intent to defraud. *Id.* at 1582 (quoting 4 *Collier on Bankruptcy* ¶ 548.02[5] at 548–34 to 38 (L. King 15th ed. 1983)). The existence of several badges can "constitute conclusive evidence of an actual intent to defraud." *Kirschner v. Fitzsimons (In re Tribune Co. Fraudulent Conveyance Litig.)*, No. 11-md-2296 (RJS), 2017 WL 82391, at *13 (S.D.N.Y. Jan. 6, 2017) (citation omitted); *Picard v. Nelson (In re BLMIS)*, 610 B.R. 197, 235 (Bankr. S.D.N.Y. 2019).

BLMIS' actual fraudulent intent is well-pleaded in the Complaint. (Am. Compl. ¶¶ 35–62). The Court need not infer intent to defraud because Madoff has admitted that he had actual intent to defraud when he admitted under oath that he operated a Ponzi scheme. (*Id.* ¶ 168–256). The Trustee has alleged that "BLMIS's website omitted the I[nvestment] A[dvisory] Business entirely. BLMIS did not register as an investment adviser with the SEC until 2006, following an investigation by the SEC, which forced Madoff to register." (*Id.* ¶ 35). "For more than 20 years preceding that registration, the financial reports BLMIS filed with the SEC fraudulently omitted the existence of billions of dollars of customer funds BLMIS managed through its I[nvestment] A[dvisory] Business. (*Id.* ¶ 36). BLMIS lied to the SEC in reports regarding the number of accounts it has and "grossly understated" the amount of assets under management. (*Id.* ¶ 37). BLMIS had no legitimate business operations and produced no profits or earnings. (*Id.* ¶ 38) "Madoff was assisted by several family members and a few employees, including Frank DiPascali, Irwin Lipkin, David Kugel, Annette Bongiorno, JoAnn Crupi, and others, who pleaded to, or were found guilty of, assisting Madoff in carrying out the fraud." (*Id.*). BLMIS

used its fraudulent investment advisory business to prop up its proprietary trading business, which also incurred significant losses. (*Id.* ¶ 43). "BLMIS reported falsified trades using backdated trade data on monthly account statements sent to BLMIS customers that typically reflected impossibly consistent gains on the customers' principal investments." (*Id.* ¶ 46). "There are no records to substantiate Madoff's sale of call options or purchase of put options in any amount, much less in billions of notional dollars." (*Id.* ¶ 51). "Madoff could not be using the SSC Strategy because his returns drastically outperformed the market. BLMIS showed only 16 months of negative returns over the course of its existence compared to 82 months of negative returns in the S&P 100 Index over the same time period. Not only did BLMIS post gains that exceeded (at times, significantly) the S&P 100 Index's performance, it would also regularly show gains when the S&P 100 Index was down (at times significantly). Such results were impossible if BLMIS had actually been implementing the SSC Strategy." (*Id.* ¶ 53). "There is no record of BLMIS clearing a single purchase or sale of securities in connection with the SSC Strategy at The Depository Trust & Clearing Corporation, the clearing house for such transactions, its predecessors, or any other trading platform on which BLMIS could have traded securities." (*Id.* ¶ 59). Though unnecessary, the Trustee has sufficiently pleaded the badges of fraud.

The Trustee has successfully pleaded multiple badges 2, 3, 4, 5, and 6. The Trustee need not plead all six badges of fraud to meet his burden of pleading actual fraudulent intent. *In re May*, 12 B.R. 618, 627 (N.D. Fla. 1980) ("Such indicators or badges, when established either singularly, but more often in combination, may justify the inference of the requisite intent to hinder, delay or defraud creditors.").

**BLMIS Customer Property**

Defendant argues that the Complaint fails to plausibly allege it received subsequent transfers of BLMIS customer property from the LIF-USEP.  (Mem. L. 3, ECF No. 296). Defendant states that "it is undisputed that RIR had no agreement with LIF-USEP, and that it did not have any contractual relationship with or receive any compensation from any party to this action."  (*Id.*).

Rule 8(a) governs the Trustee's pleading burden and a short and plain statement that the pleader is entitled to relief is all that is required. Fed. R. Civ. P. 8(a).  This standard of pleading is meant to ensure that the defendant has proper notice of the claim, while recognizing the limitations a plaintiff may have in setting out each detail of the claim before discovery.  *In re Enron Corp.*, No. 01-16034 AJG, 2006 WL 2400369, at *4 (Bankr. S.D.N.Y. May 11, 2006).  In a subsequent transfer claim, this means only that a defendant must be adequately apprised of the subsequent transfers that the Trustee seeks to recover.  *Picard v. Cohmad* (*In re BLMIS*), 454 B.R. 317, 340 (Bankr. S.D.N.Y. 2011) ("*Cohmad II*").  In the Complaint, the Trustee provides the Subsequent Transfer Defendants with the "who, when, and how much" of the purported transfers.  *Cohmad II*, 454 B.R. at 340; (Am. Compl. ¶¶ 270–76).

> Based on the Trustee's investigation to date, RIR received at least $4,324,482 in subsequent transfers from LIF-USEP:
>
> a.  Reliance Gibraltar received at least $2,358,709 in advisory fees from UBS SA and UBSTPM, consisting of management fees UBS SA and UBSTPM received from LIFUSEP in connection with Reliance Gibraltar's role as LIF-USEP's investment advisor from September 2005 to December 2008.
>
> b.  Upon information and belief, Reliance Gibraltar received additional fees from UBS SA and UBSTPM based upon amounts collected from LIF-USEP.
>
> c.  Reliance Gibraltar shared a portion of these fees with RIR. From January 2006 through December 2008, Reliance Gibraltar transferred at least

> $4,324,482 to RIR's New York bank account in connection with the provision
> of services to all investment funds.

(*Id.* ¶ 273).

Contrary to the Defendant's assertion that it received no compensation from any party to this action, the Complaint states: "Reliance Gibraltar and RIR received substantial fees for the services they provided LIF-USEP." (Am. Compl. ¶ 83). Pursuant to agreements between the two entities, "Reliance Gibraltar subsequently paid to RIR a portion of the fees derived from LIF-USEP. These fees were transferred to RIR's bank account in New York." (*Id.*). Defendant and other service providers of LIF-USEP "received millions of dollars in fees for their work on behalf of the fund." (*Id.* ¶¶ 171, 173).

The Trustee has alleged that the LIF-USEP sole business was investing with BLMIS. (*Id.* ¶ 18) ("LIF-USEP's sole purpose was to direct investments into BLMIS in New York. Thus, the ultimate source of profit and/or revenue, for all of the Defendants in this action . . . ."). The feeder fund received hundreds of millions of dollars in initial transfers of customer property from BLMIS. (*Id.* ¶ 266) ("BLMIS made transfers to or for the benefit of LIF-USEP in the amount of at least $498,300,000 . . . ."). The subsequent transfers made from the feeder fund to Defendants are very likely comprised of BLMIS customer property.

As has previously been stated by this Court,

> the Trustee is an outsider to these transactions and will need discovery to identify the specific subsequent transfers by date, amount and the manner in which they were effected. The Moving Defendants are a group of interrelated individuals and entities .... Whether they additionally received Subsequent Transfers of BLMIS funds from one another is a question to which they, and they alone, have the requisite information to respond.

*Picard v. Mayer (In re BLMIS)*, No. 08-01789, Adv. No. 20-01316, 2021 WL 4994435, at *5 (Bankr. S.D.N.Y. Oct. 27, 2021).

These allegations provide more than enough detail to apprise Defendants of the

subsequent transfers the Trustee is seeking to collect.

**Good Faith**

Defendant joins in the UBS Defendants' raising of the affirmative defense of good faith.

(Mem. L., ECF No. 296).  UBS Defendants argue that the "Trustee may not recover from a

subsequent transferee who took for value, in good faith, and without knowledge of the

voidability of the transfer."  (Mem. L. of UBS Defs. 27, ECF No. 289).

     *i.*     *For Value*

The "value" that a subsequent transferee must provide is "merely consideration sufficient

to support a simple contract, analogous to the 'value' required under state law to achieve the

status of a bona fide purchaser for value."  *Picard v. Legacy Capital Ltd.* (*In re BLMIS*), 548

B.R. 13, 37 (Bankr. S.D.N.Y. 2016) (citation omitted); *accord Enron Corp. v. Ave. Special

Situations Fund II, L.P.* (*In re Enron Corp.*), 333 B.R. 205, 236 (Bankr. S.D.N.Y. 2005).  In

addition, the "value" element under § 550(b)(1) looks to what the transferee gave up rather than

what the transferor received.

The UBS Defendants argue that "the UBS Defendants are alleged to have provided

services to LIF-USEP" which constitute value.  (Mem. L. of UBS Defs. 28, ECF No. 289).  This

Court has found that, where the Complaint alleges that "Defendants received fees for pretending

to provide services, which they knew to be done by BLMIS," the services do not satisfy the

value requirement.  *Picard v. UBS AG*, Adv. Pro. No. 10-04285 (CGM), 2022 WL 17968924, at

*17 (Bankr. S.D.N.Y. Dec. 27, 2022).

Defendant, along with M&B, served officially "as the [feeder] fund's distributor and

advisor."  (Am. Compl. ¶ 259).  The Complaint shows that the Defendant received fees for

pretending to provide services that were performed by BLMIS.  (*Id.* ¶ 250) ("Reliance also repeatedly recognized that receipt of paper-only trade confirmations impeded its ability to monitor BLMIS's purported trading activity."); (*id.* ¶¶ 217–18) (stating that Reliance and UBS SA reviewed filings at a time when "there was no time when there were enough options on the listed market to implement Madoff's purported SSC strategy."); (*id.* ¶ 252) ("As a result of BLMIS's delays in providing trade information, Reliance Gibraltar provided UBS SA with backdated monthly investment recommendations for LIF-USEP.").  The "value" defense is not asserted on the face of the Complaint.

"Value" is Defendant's burden to plead and prove.  *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 198 (Bankr. S.D.N.Y. 2018).  Whether Defendants gave value is a question of fact to be resolved either at the summary judgment stage or at trial.  *Picard v. Fairfield Inv. Fund (In re BLMIS)*, No. 08-01789 (CGM), Adv Pro. No. 09-01239 (CGM), 2021 WL 3477479, at *9 (Bankr. S.D.N.Y., Aug. 6, 2021).

ii.      *Good Faith*

Where, in light of surrounding circumstances, a transferee should have known of the debtor's precarious financial condition, the transferee will be deemed to have taken in bad faith, unless an investigation into the debtor's financial condition actually discloses no reason to suspect financial trouble.  2 Bankruptcy Desk Guide § 19:105.  The District Court recently explained that good faith is a fact-intensive inquiry that almost always requires a trial: "[t]he Second Circuit made clear . . . that the inquiry notice standard requires a 'fact-intensive inquiry to be determined on a case-by-case basis, which naturally takes into account the disparate circumstances of differently-situated transferees.'"  *In re BLMIS*, No 20-cv-02586(CM), 2022 WL 1304589, at *3 (S.D.N.Y. May 2, 2022) (citing *Picard v. Citibank, N.A.* (*In re BLMIS*), 12

F.4th 171 (2d Cir. 2021), cert. denied No. 21-1059 (Feb. 28, 2022).  And that "such a fact-based determination can only be made based on the entirety of the factual record after discovery . . . ." *Id.* (internal quotation omitted).

The Complaint alleges that the Defendant participated with BLMIS in the fraud.  (Am. Compl. ¶ 3); (*id.* ¶ 18) ("All of the Defendants together engaged in an effort to direct investor funds into New York via BLMIS and to profit therefrom.").  The burden of proving good faith falls squarely on Defendant, and this Court cannot make a determination on Defendant's affirmative defense until after a fact-intensive inquiry.  Discovery is required on this issue.

iii.    *Knowledge of Avoidability*

As has been stated numerous times, the Complaint alleges that the defendants knew of the fraud.  (Am. Compl. ¶¶ 116–256).

Good faith is linked with whether one had knowledge of the voidability of the transfer. *Picard v. Citibank, N.A.* (*In re BLMIS*), 12 F.4th 171, 189 (2d Cir. 2021) ("[A] transferee does not act in good faith when he has sufficient actual knowledge to place him on inquiry notice of the debtor's possible insolvency."), *cert. denied sub nom. Citibank, N.A. v. Picard*, 212 L. Ed. 2d 217, 142 S. Ct. 1209 (2022).  Having determined that "good faith" cannot be found on the face of a complaint, the Court must deny the Defendant's motion on this element.  Additionally, § 550(b)(1) provides a defense to recovery making lack of knowledge Defendant's burden to plead and prove.  It is a fact-intensive inquiry that requires a three-step inquiry into 1) what Defendant subjectively knew; 2) "whether these facts put [it] on inquiry notice of the fraudulent purpose behind a transaction—that is, whether the facts the transferee[s] knew would have led a reasonable person in [its] position to conduct further inquiry into a debtor-transferor's possible

fraud; and 3) whether "diligent inquiry by [Defendant] would have discovered the fraudulent purpose of the transfer." *Id.* at 192.

It is not appropriate for the Court to resolve these factual issues at this stage of the litigation.

### <u>Conclusion</u>

For the foregoing reasons, the RIR's motion to dismiss is denied. The Trustee shall submit a proposed order within fourteen days of the issuance of this decision, directly to chambers (via E-Orders), upon not less than two days' notice to all parties, as required by Local Bankruptcy Rule 9074-1(a).



**/s/ Cecelia G. Morris**

_____
**Hon. Cecelia G. Morris**
**U.S. Bankruptcy Judge**

**Dated: October 16, 2023**
**Poughkeepsie, New York**